## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**DR. GAVIN CLARKSON, an individual,**

**Plaintiff,**

**Civ. No. 18-870 KRS/GBW**

**v.**

**BOARD OF REGENTS OF NEW MEXICO
STATE UNIVERSITY, DAN HOWARD in his
individual capacity and official capacity as
Provost; JAMES HOFFMAN in his individual
capacity and official capacity as Dean; ENRICO
PONTELLI in his individual capacity and
official capacity as Hearing Officer, and
NANCY ORETSKIN in her individual capacity
and official capacity.**

**Defendants.**

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING VIOLATION OF DUE PROCESS – 42 U.S.C. § 1983

Pursuant to Fed. R. Civ. P. 56, Plaintiff Dr. Gavin Clarkson ("Plaintiff" or "Dr. Clarkson") respectfully moves this Court for an order granting summary judgment as to Dr. Clarkson's Second Cause of Action for Violation of Dr. Clarkson' Right to Due Process of Law under 42 U.S.C. § 1983. The granting of the instant Motion is consistent with the United States Constitution and the New Mexico Constitution.

This Motion is made and based on the pleadings and papers on file herein, the declaration of Dr. Clarkson, the Exhibits attached hereto, and any oral argument this Court may entertain.

## I.   INTRODUCTION

There is no dispute in this matter regarding the procedural deficiencies of Dr. Clarkson's administrative hearing with NMSU. Defendants withheld critical information from Dr Clarkson

despite his numerous requests for the information prior to the day of the administrative hearing at issue. Instead of providing Dr. Clarkson with a fair and impartial hearing, Defendants engaged in a trial by ambush which failed to accord Dr. Clarkson a fair opportunity to be heard.

Not only did Defendants deny Dr. Clarkson of his constitutionally protected right to due process it is clear that the individuals that were involved in his hearing never had any intention of affording Dr. Clarkson a fair hearing. It is a fundamental paradigm in the United States that administrative agencies, when acting in an adjudicatory capacity, must do so in a fair and impartial manner. Further, even the appearance of bias is enough to infect the proceedings and render Dr. Clarkson's due process rights, nonexistent.

## II.  STATEMENT OF UNDISPUTED FACTS

The following undisputed material facts entitle Dr. Clarkson to judgment as a matter of law:

### A.  Background Facts Related to Dr. Clarkson's Unconstitutional Termination.

1.      Dr. Clarkson is an enrolled member of the Choctaw Nation, a federally recognized Indian tribe, and was an Associate Professor in the College of Business at New Mexico State University until April 27, 2018. *See* Declaration of Dr. Gavin Clarkson ("Clarkson Decl.") at ¶, attached hereto as Exhibit 1.

2.      Dr. Clarkson has a BA and MBA from Rice University, is a cum laude graduate of the Harvard Law School where he was President of the Native American Law Students Association and Managing Editor of the Harvard Journal of Law and Technology. Clarkson Depo. at ¶4. Dr. Clarkson was also the first tribal member to earn a doctorate from the Harvard

Business School (in Technology and Operations Management). Clarkson Decl. at ¶ 4; NMSU_Clarkson 00011-12, 00016-21[1].

3.      Dr. Clarkson has been named the nation's "leading scholar in tribal finance" by The Financial Times, Dr. Clarkson has been cited by Bloomberg, the Wall Street Journal, and USA Today on matters of tribal finance and rural economic development, subjects he has taught as a professor at the University of Michigan, University of Houston, University of Montana, as well as NMSU. Clarkson Decl. at ¶ 5.

4.      Upon information and belief, it is alleged that as of 2018, Dr. Clarkson had sole-authored more law review articles than the entire rest of the NMSU business law faculty combined. Clarkson Decl. at ¶ 5.

5.      Dr. Clarkson was specifically recruited by Dr. Garrey Carruthers to the College of Business at NMSU to "do Indian stuff," including being the faculty sponsor of the Native American Business Students Association and increasing the amount of tribal finance and economic development research at NMSU. Clarkson Decl. at ¶ 6.

6.      In part, because of his academic credentials and nationally recognized research expertise, Dr. Clarkson was appointed as the Deputy Assistant Secretary for Policy and Economic Development ("DASPED") in the Department of the Interior in June of 2017. Clarkson Decl. at ¶ 7.

7.      Dr. Clarkson had also been offered the position of Deputy Director of Indian Energy Policy and Programs in the Department of Energy, but after careful consideration, chose the position at the Department of the Interior instead. Clarkson Decl. at ¶ 8.

8.      Pursuant to NMSU's Administrative Rules and Procedures ("ARP") §8-53, Dr.

[1] References to "NMSU_Clarkson" documents are true and correct copies of documents produced by Defendants in this matter and are attached as Exhibit 2-A to the Declaration of Brian J. Pezzillo. Declaration of Brian J. Pezzillo is attached hereto as Exhibit 2.

Clarkson requested and was granted a professional leave of absence until January, 2020 in a written letter from Provost Howard dated June 28, 2017. Clarkson Decl. at ¶ 9; *see also* NMSU_Clarkson 00006-7, 00215-16.

9. Additionally, the written document from Provost Howard specifically granted Dr. Clarkson a pause in his tenure clock until the Fall of 2020. Clarkson Decl. at ¶ 10; *see also* NMSU_Clarkson 00006-7.

10. Dr. Clarkson requested the option of extending the leave for an additional 12 months until January 2021. Provost Howard denied that request in the written grant of leave. Clarkson Decl. at ¶ 11; *see also* NMSU_Clarkson 00006-7.

11. Dr. Clarkson requested that, upon his return to the faculty, he be given control of the Indian Resource Development Program. Provost Howard denied that request in the written grant of leave. Clarkson Decl. at ¶ 12; *see also* NMSU_Clarkson 00006-7.

12. ARP §8.53-G states "All conditions of professional leave without pay, including the status of the individual upon return to the university and (if appropriate) the effect of this period on tenure and promotion eligibility, must be in writing prior to the leave period." Nowhere in the written grant of leave from Provost Howard are any conditions specified under which Dr. Clarkson's leave could be unilaterally cancelled by NMSU or Provost Howard. Clarkson Decl. at ¶ 13; *see also* ARP §8.53-G.

13. At the time of his appointment as DASPED, Dr. Clarkson was preparing to teach an online course at NMSU, and he didn't want to abandon his students, so he requested that his leave begin after the end of the summer semester. He then requested and was granted ethics clearance by the Department of Interior to teach the course while he served as the DASPED. Clarkson Decl. at ¶ 14; *see also* NMSU_Clarkson 00006-7.

14.     NMSU has previously attempted to discriminate against and terminate Dr. Clarkson on at least one other occasion. Approximately two weeks after Dr. Clarkson attended the presidential inauguration in January 2017, a defamatory dossier was submitted to his supervisors alleging that he had engaged in plagiarism. Since Dr. Clarkson is the nation's leading scholar in tribal finance, however, they were unable to document any cases of actual plagiarism and instead compiled a dossier alleging "self-plagiarism." Clarkson Decl. at ¶ 15; *see also* CLARKSON_000029-35.

15.     The fake dossier contained passages that Dr. Clarkson periodically re-uses, with proper attribution, from earlier articles. The fake dossier omitted these attributions in an attempt to persuade the Promotion & Tenure ("P&T") committee not to renew Dr. Clarkson's contract. Clarkson Decl. at ¶ 16.

16.     Based on information obtained in a separate administrative hearing, one of the professors behind this effort, Professor Nancy Oretskin, admitted under oath that she had been involved in targeting Dr. Clarkson for years. Based on information and belief, Defendant Oretskin was involved in either the preparation, dissemination, or discussion of that defamatory dossier at Dr. Clarkson's prior P&T committee reviews. Defendant Oretskin had also publicly denigrated Dr. Clarkson's scholarship regarding Indian tribes and had declared that it was a waste of time to teach anything regarding Indians to business law students in New Mexico. Clarkson Decl. at ¶ 17.

17.     Additionally, in or around August 2014, during an NMSU governmental relations meeting, Defendant Dean Hoffman commented that he would prefer someone other than Dr. Clarkson to run a specific Native American program because he wanted someone who "looked more like a New Mexican Indian." Clarkson Decl. at ¶ 18.

18.     During the time that Dr. Clarkson was serving in Washington D.C., Congressman Steve Pearce decided to run for Governor of New Mexico instead of seeking another term in Congress. Dr. Clarkson began seriously considering leaving Interior and running for the open seat, given that one of his mentors, Garrey Carruthers, had taken a similar path. Clarkson Decl. at ¶ 19.

19.     In November 2017, a false news story appeared in the Washington Post alleging that Dr. Clarkson had resigned because of a report about problems with the Indian Loan Guarantee Program during the Obama Administration. Clarkson Decl. at ¶ 20; *see also* NMSU_Clarkson 00181-84.

20.     On November 15, 2017, Provost Howard acknowledged receipt of the false news story, but he took no steps to contact Dr. Clarkson or cancel his leave. Clarkson Decl. at ¶ 21.

21.     Provost Howard would later testify, under oath, that as of November 15, 2017 he fully expected that Dr. Clarkson would be rejoining the faculty in January 2018. Based on information and belief, his statement was demonstrably false. Furthermore, the Provost took no steps whatsoever indicating any expectation that Dr. Clarkson would be returning to the faculty anytime other than January 2020. Clarkson Decl. at ¶ 22.

22.     On December 14, 2017, Dr. Clarkson received email correspondence confirming that he was still on professional leave of absence. Clarkson Decl. at ¶ 23.

23.     On December 29, 2017, Dr. Clarkson submitted a letter of resignation to Secretary Zinke. Clarkson Decl. at ¶ 24.

24.     Upon information and belief, it is alleged that NMSU wrongly claims that the act of resigning from the Department of the Interior resulted in revocation of Dr. Clarkson's leave. Clarkson Decl. at ¶ 25.

25.     Despite claims that Dr. Clarkson's leave of absence was terminated by his resignation, upon information and belief it is alleged that NMSU took no action to return him to the faculty and did so only after his announcement that he was running for Congress. Clarkson Decl. at ¶ 26.

26.     On January 1, 2018, Dr. Clarkson moved back to Las Cruces and started preparing for his upcoming campaign for New Mexico's 2nd Congressional District. Clarkson Decl. at ¶ 27.

27.     On January 4th, Finance Department head Harikumar Sankaran emailed Dr. Clarkson that he is assuming that Dr. Clarkson will return for the Fall 2018 semester. No mention is made of teaching in Spring 2018 or cancellation of Dr. Clarkson's leave. Clarkson Decl. at ¶ 28.

28.     As a courtesy, Dr. Clarkson replied back to Sankaran indicating that he is running for Congress. Clarkson Decl. at ¶ 29.

29.     On January 5, 2018, Sankaran reminded the Provost in an email that Dr. Clarkson was on leave even through the Fall of 2018. The Provost's written response does not contradict the statement that Dr. Clarkson remains on leave. Clarkson Decl. at ¶ 30.

30.     Also, on January 5th, 2018, Dr. Clarkson filed paperwork to enter the race as a Republican for New Mexico's 2nd Congressional District. Clarkson Decl. at ¶ 31.

31.     On January 8th, 2018, Dr. Clarkson formally announced his candidacy at a meeting of Dona Ana County Republicans. Clarkson Decl. at ¶ 32.

32.     On January 9th, 2018, the Las Cruces Sun-News ran a story about Dr. Clarkson's running for Congress, highlighting, among other items, his membership in an Indian tribe and his having been "named the nation's 'leading scholar in tribal finance' by The Financial Times [and

having] been cited by Bloomberg, the Wall Street Journal and USA TODAY on matters of tribal finance and federal Indian law." Other national publications similarly highlighted Dr. Clarkson's tribal heritage. Clarkson Decl. at ¶ 33.

33.     On January 9th, Sankaran, Provost Howard and General Counsel Lizbeth Ellis initiated a conversation on how to respond. Clarkson Decl. at ¶ 34; NMSU_Clarkson 00185.

34.     On January 10th, Sankaran asked Dr. Clarkson to schedule a meeting with himself, the Associate Dean and the Dean of the College of Business to discuss the status of his leave. He mentions that several options regarding the leave will be on the table. He also sent a Doodle Poll meeting request. Clarkson Decl. at ¶ 35.

35.     Additionally, on January 10th, the assistant to the Provost wrote a message asking the Dean to "hold off on talking [about] options for the Clarkson leave of absence until [he had] talked with the Provost." This change in direction was allegedly based on "new information." Clarkson Decl. at ¶ 36.

36.     Faculty were to report to campus by January 11, 2018 in conjunction with the beginning of the next semester. The first paycheck for faculty would have been issued January 12, 2018 covering the time period between January 1, 2018 and January 15, 2018. Clarkson Decl. at ¶ 37.

37.     Upon information and belief, it is alleged that at 6:08pm on January 11th, Sankaran emailed that "I was advised the NMSU Attorney General Liz Ellis that the Provost is going to send a letter with options to Gavin. Until then we will not be meeting." Clarkson Decl. at ¶ 38.

38.     On Friday morning, January 12th, Dr. Clarkson voluntarily attended the Finance Department faculty meeting. He reminded everyone that he is on leave while he is running for

office. At that meeting nobody disputed that he was on leave, and it is confirmed that he is not on the schedule to teach in the Spring of 2018. Clarkson Decl. at ¶ 39.

39.     Later, on January 12th, at the end of the day before the Martin Luther King holiday weekend, Provost Howard sent Dr. Clarkson a letter revoking his leave and demanding that he either resign immediately or return to campus the next business day. The letter also contained a provision that Dr. Clarkson's tenure evaluation would begin in the Fall of 2018. Clarkson Decl. at ¶ 40; *see also* NMSU_Clarkson 00005.

40.     Dr. Clarkson attempted to call Provost Howard back within a few minutes of receiving the letter, but according to his assistant, he had already left for the day. Dr. Clarkson gave the assistant his personal cell phone number and asked that the Provost call him to discuss. No such call took place until the following week. Clarkson Decl. at ¶ 41; NMSU_Clarkson 00188.

41.     Dr. Clarkson did not receive a paycheck from NMSU on January 12, 2018. Clarkson Decl. at ¶ 42.

42.     If, as NMSU claims, they were anticipating Dr. Clarkson's return to campus for the Spring of 2018, then Dr. Clarkson should have received a paycheck on January 12, 2018, which did not occur. Clarkson Decl. at ¶ 43.

43.     On January 16th, Dr. Clarkson voluntarily attended the College of Business convocation and "checked in" with Finance Department Head Sankaran. Clarkson Decl. at ¶ 44.

44.     Also, on January 16th, Sankaran mentioned in an email to the Provost that the General Counsel had made some disparaging remarks regarding Dr. Clarkson's presence on campus, presumably because Dr. Clarkson had previously flown back to Houston to take care of his teenage son and elderly mother. Clarkson Decl. at ¶ 45.

45. No mention was made of monitoring other faculty member's presence on campus. NMSU has claimed attorney-client privilege in order to keep such relevant information from Dr. Clarkson. Clarkson Decl. at ¶ 45.

46. Upon information and belief, it is alleged that in that same email, there was a discussion about hindering Dr. Clarkson's run for Congress. Clarkson Decl. at ¶ 45.

47. In Response, the Provost indicated that Dr. Clarkson is to be on campus at all times (a requirement that is not imposed on any other faculty member anywhere at NMSU). He also declared that Dr. Clarkson will have to go up for tenure two years earlier than promised in the grant of professional leave. Clarkson Decl. at ¶ 45.

48. On Wednesday, January 17th, the Provost called Dr. Clarkson on his personal cell phone. In that conversation, the Provost claimed that the leave was automatically cancelled the moment that Dr. Clarkson resigned his position within the Presidential administration. The Provost further claimed that he was aware in November 2017 that Dr. Clarkson would be leaving the Interior and was expecting him back on campus for Spring 2018.

49. During the conversation the Provost stated that the leave was only for the position of Deputy Assistant Secretary at Interior. He claimed that if Dr. Clarkson had changed jobs in the Trump Administration, either to the position at the Department of Energy or presumably a promotion within Interior, the leave would still have automatically cancelled although no such restrictions were ever made in writing prior to Dr. Clarkson's leave.

50. Upon information and belief, it is alleged that the Provost pretextually told Dr. Clarkson that the leave was being cancelled because his presence was desperately needed on campus. Dr. Clarkson told the provost that he was willing to teach classes while on leave if there was a curricular need. The Provost then told Dr. Clarkson to work out an arrangement with Dean

Hoffman. NMSU_Clarkson 00195, 00207-09.

51.     Dr. Clarkson then had a subsequent call with Dean Hoffman during which Dr.

Clarkson repeated his offer to teach courses while on leave if there is a curricular need. *See*

NMSU_Clarkson 00205-06.

52.     On Friday, January 19th, Sankaran emailed Dr. Clarkson indicating that he is

being scheduled for three intensive "mini-mester" courses, one of which Dr. Clarkson had never

taught and one of which he had never taught in the "mini-mester" format. NMSU_Clarkson

00191-92.

53.     On January 23rd, Dr. Clarkson was ambushed in the meeting by both Provost

Howard and General Counsel Ellis. Since he was not afforded the opportunity to have his own

attorney present, he declined to continue the meeting. Dr. Clarkson did point out that, and it was

acknowledged by the Dean, that Dr. Clarkson had not been returned to the NMSU payroll as of

January 23rd, midway through the second pay period of the Spring 2018 semester.

NMSU_Clarkson 00194.

54.     On January 24, 2018, also at close of business, HR, Employee, and Labor

Relations Director Ralph Lucero emailed Dr. Clarkson a letter from the Provost proposing his

termination. NMSU_Clarkson 00211-12.

55.     On January 31,2018, Dr. Clarkson filed a timely appeal of the proposed

termination.

**B. Dr. Clarkson's Administrative Hearing and Eventual Termination.**

56.     After additional NMSU delays and a continued refusal to provide all relevant

information and access to witnesses, the Pre-Action Determination Hearing took place on Friday,

April 13, 2018. The hearing was required to be a fair and impartial hearing pursuant to NMSU's

own administrative rules as well as basic due process. ARP § 10.50; NMSU_Clarkson 00147, 00235-37.

57.     NMSU selected a hearing officer, Enrico Pontelli, who was not only hired by Provost Howard but directly reports to Provost Howard. Provost Howard was acting as the lead "prosecutor" in the hearing, and despite Dr. Clarkson's objections to the obvious conflict of interest, the hearing officer did not recuse himself. NMSU_Clarkson 00235-37; *See* Clarkson Hearing_Recording 1, at 1:15 – 1:50, audio copies of which are attached to the Declaration of Gavin Clarkson as Exhibit 1-A.

58.     At the outset of the hearing, Dr. Clarkson noted on the record that he still "had an outstanding document request." Despite noting his outstanding document request, and Mr. Pontelli specifically acknowledging the outstanding records request, the hearing proceeded forward in violation of Dr. Clarkson's Constitutional right to due process. *See* Clarkson Hearing_Recording 1, at 3:10 – 3:22.

59.     Surprisingly, after acknowledging Dr. Clarkson's outstanding records request, Mr. Pontelli noted that the hearing was being provided to Dr. Clarkson to ensure that he was afforded due process. *See* Clarkson Hearing_Recording 1, at 3:22 – 3:32.

60.     Further, when asked what his definition or idea of due process was, Provost stated the following: "we try to move forward in a way that would keep everybody's rights in mind." Clarkson Hearing_Recording 1, at 55:45 – 56:00. Although Provost knew what due process was, he still proceeded with engaging in the tainted hearing against Dr. Clarkson.

61.     The hearing then proceeded with Provost providing his opening statement in favor of Dr. Clarkson's termination, which in part he based his statement on the erroneous statement that Dr. Clarkson had resigned from DASPED in November of 2017 (reliance on the fake news

article). However, Provost then admitted that he did not inform Dr. Clarkson of the revocation of his leave until January 12, 2018 – a mere four days before he expected Dr. Clarkson back on campus. *See* Clarkson Hearing_Recording 1, at 6:45 – 8:28.

62.     After Provost's opening statement, Dr. Clarkson proceeded with his opening statement. During his opening statement, Dr. Clarkson pointed out the contradictory nature of Provost's comments and noted that Provost did not attempt to terminate his leave of absence until after he learned of Dr. Clarkson running for congressional office on January 8, 2018. Dr. Clarkson similarly referenced the false allegations of  plagiarism alleged against him by Dr. Oretskin as well as the lack of authority held  by Provost to unilaterally terminate his  leave. Finally, Dr. Clarkson ended his opening statement by again noting  the Constitutional inadequacies of the administrative process due to NMSU's refusal to handover vital evidence. Specifically, Dr. Clarkson noted that there <u>were five (5) affidavits prepared in preparation of the hearing and he was only provided with one</u>. *See* Clarkson Hearing_Recording 1, at 8:30 – 16:22 (emphasis supplied).

63.     Throughout the entirety of the hearing, Dr. Clarkson was ambushed with numerous documents that he was not provided with – despite his repeatedly requesting the records and noting his outstanding records request at the inception of the hearing. *See* Clarkson Hearing_Recording 1, at 3:10 – 3:22. Specifically, some examples where Dr. Clarkson can be heard objecting to the documents not produced to him are as follows:

> a.  Clarkson Hearing_Recording 1, at 20:25 – 20:35 – Dr. Clarkson was not provided with correspondence between Provost and Dean Hoffman regarding Dr. Clarkson's request for leave of absence.

> b.  Clarkson Hearing_Recording 1, at 25:40 – 25:55 – Dr. Clarkson was not

provided with fake news article regarding his alleged departure from DASPED in November of 2017.

   c.   Clarkson Hearing_Recording 1, at 46:10 – 46:37 – NMSU refused to allow Dr. Clarkson's investigators to interview the hearing witnesses prior to the day of the hearing.

   d.   Clarkson Hearing_Recording 2, at 18:40 – 19:45 – NMSU refused to provide numerous communications regarding Dr Clarkson's termination under false assertions of attorney-client privilege.

64.   At the hearing, both the Provost and the Dean admitted, under oath, that neither of them took any actions whatsoever regarding Dr. Clarkson's leave until after he announced his run for Congress. *See* Clarkson Hearing_Recording 1, at 24:50 – 26:45, 53:00 – 53:10.

65.   The Provost also admitted, under oath, that nothing in the grant of professional leave gave the Provost the authority to unilaterally cancel the leave. *See* Clarkson Hearing_Recording 1, at 39:30 – 39:52, 41:30 – 41:45.

66.   Despite swearing an oath to "tell the truth, the whole truth, and nothing but the truth," both the Dean and Defendant Oretskin refused to answer numerous relevant questions at the hearing regarding the tainting of the tenure process and Plaintiffs continued employment. Upon information and belief, it is alleged that this was done in an effort to prevent Plaintiff from being afforded a full and fair hearing and interfered with his ability to present relevant facts to the hearing officer. *See, e.g.*, Clarkson Hearing_Recording 1, at 46:50 – 49:00.

67.   The hearing officer, Mr. Pontelli, further did not compel the witnesses to provide testimony which was relevant to the administrative hearing. Clarkson Decl. at ¶ 65. Specifically, Mr. Pontelli can be heard allowing the witnesses to refuse to answer relevant lines of questions

at:

> a. Clarkson Hearing_Recording 1, at 46:50 – 49:00 – After Provost refused to answer questions related to his memory of certain events, and if he had any memory problems, Mr. Pontelli allowed Provost to not answer the relevant questions.

68.     As expected, given the fundamental lack of due process and inherent conflicts of interest, the hearing officer ruled in favor of his direct superior and against Dr. Clarkson. NMSU_Clarkson 00158-61.

69.     The hearing officer did not apply the appropriate standard for burden of, nor did he apply it against the correct party, which should have been NMSU. The opinion itself ignored the plain text of the leave granting document and instead engaged in contract by inference and anecdote as opposed to the rule of law. NMSU_Clarkson 00158-61.

70.     Despite ruling against Dr. Clarkson and in favor of his direct superior, Provost Howard, the hearing officer nevertheless found NMSU's conduct troubling, saying NMSU's "communication with Dr. Clarkson has been antagonistic, especially at the Department and College levels, with limited attempts to seek mutual understanding and establish a positive protocol of communication and interaction." NMSU_Clarkson 00158-61.

71.     On April 25, Dr. Clarkson filed a timely appeal of the Pre-Action Determination Hearing to the faculty senate, pursuant to ARP §10-50-N. NMSU_Clarkson 00125, 00148-50.

72.     On April 30, despite the pending appeal, Dr. Clarkson's employment was terminated effective April 27, 2018. NMSU_Clarkson 00002-3, 00153.

/ / /

/ / /

C. **STANDARD OF REVIEW**

Summary judgment is an integral part of the Federal Rules of Civil Procedure, which are intended to "secure the just, speedy and inexpensive determination of every action." *Celotex Corp.v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed.R.Civ.P. 1). Under Rule 56(c), summary judgment is appropriate when the court, viewing the record in the light most favorable to the non- moving party, determines that "there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law." *Thrasher v. B&B Chemical Co.*, 2 F.3d 995, 996 (10th Cir. 1993). Under Rule 56(c), "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248, 106 S.Ct. 2505.

The movant bears the initial burden of showing "there is an absence of evidence to support the nonmoving party's case." *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir.1993) (citations omitted); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). Once the movant meets this burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. The nonmoving party cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment, *Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir.1988). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue

for trial." *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir.1993) (citations omitted); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

If the court determines that no genuine issue of material fact exists, even after viewing the facts in the light most favorable to the nonmovant, it must determine that the movant is entitled to judgment as a matter of law. *See, e.g., Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir.1996); *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

## D. DR. CLARKSON IS ENTITLED TO PARTIAL SUMMARY JUDGMENT

### A. Due Process Background.

Under a 42 U.S.C. § 1983 due process claim, plaintiffs are tasked with establishing that the "defendants acted under the color of state law and that the defendants' actions deprived [plaintiffs] of some federal right. *Montgomery v. City of Ardmore*, 365 F.3d 926, 935 (10th Cir. 2004); *see also*, *Schanzenbach v. Town of La Barge*, 706 F.3d 1277, 1283-84 (10th Cir. 2013). The courts, in assessing whether an individual was denied procedural due process, must engage in a two-step inquiry: "(1) did the individual possess a protected interest such that the due process protections were applicable; and, if so, then (2) was the individual afforded an appropriate level of process." *Id.* Put another way, plaintiffs must prove: "(1) he possessed a protected interest to which due process protections were applicable; and (2) he was not afforded an appropriate level of process." *Rocky Mountain Rogues, Inc. v. Town of Alpine*, 375 F. App'x 887, 891 (10th Cir. 2010). Once it is determined that due process applies, the question becomes what process is due. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 541 (1985).

### B. Dr. Clarkson Possessed a Constitutionally Protected Right to Continued Employment with NMSU.

Property interests related to due process for continued employment are not created by the federal constitution, but "are created and their [property rights] dimensions are defined by

existing rules or understandings that stem from an independent source such as state law." *Goudeau v. Indep. Sch. Dist. No. 37 of Okla. Cty., Okla.*, 823 F.2d 1429, 1430 (10th Cir. 1987), *quoting Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Further, the Tenth Circuit has found that determining whether an employee has a property interest in continued employment giving rise to a constitutionally protected right are not "natural," rather, the rights are derived from government's action of guaranteeing the protection of that employee's interests. *Hyde Park Co. v. Santa Fe City Counsel*, 226 F.3d 1207, 1210 (10th Cir. 2000). In determining whether a government entity has created a property right, the Tenth Circuit explained that state and municipal law can create property rights protected under the United States Constitution. *Clinger v. New Mexico Highlands Univ. Bd. Of Regents*, 215 F.3d 1162, 1167 (10th Cir. 2000); *Teigan v. Renfrow*, 511 F.ed 1072, 1079 (10th Cir. 2007) (property interest can be created by "independent sources such as state or federal statute, a municipal charter or ordinance, or an implied or express contract."). In fact, New Mexico courts have determined that an employee's public employment may be a property right protected by the Due Process Clause of the United States Constitution. *City of Albuquerque v. AFSCME Council 18 ex rel. Puccini*, 149 N.M. 379, 382 (2011) ("As a general principle of due process law, public employees with a legitimate expectation of continued employment are protected from termination without just cause, notice, and opportunity to be heard.").

It is undisputed that Dr. Clarkson was an employee of NMSU and that he had a written contract with NMSU that set forth the terms of his employment, which required "just cause" for termination. Given the fact that Dr. Clarkson could not be fired without "just cause," it logically follows that NMSU created Dr. Clarkson's protected property right to continued employment

with NMSU. Further evidencing Dr. Clarkson's Constitutional right to continued employment are NMSU's own administrative rules in place. Specifically, ARP § 10.01 provides:

> Due process opportunities are available to all regular employees. These policies and procedures are designed to provide an objective consideration of employee grievances. Employees are provided peer group representation on review boards and committees in order to ensure fair and impartial hearings of their complaints.

ARP § 10.01 (emphasis supplied). Clearly, Dr. Clarkson possessed a due process right as created by NMSU's own policies and procedures. Given Dr. Clarkson's constitutionally protected right to continued employment with NMSU, the only other consideration by this Court should be whether appropriate processes were provided to Dr. Clarkson after he was terminated.

### C. Dr. Clarkson was Not Afforded Due Process During his Termination Proceedings.

The Tenth Circuit has found that employees with a protected right to employment, and without proper procedures, "can never discover whether the reasons offered for [their] discharge are true—or are false and mere subterfuge." *Goudeau*, 823 F.3d at 1431. The Supreme Court has routinely held that due process requires a hearing prior to the discharge of an employee who has a constitutionally protected right in his employment. *Loudermill*, 470 U.S. at 542. Although a hearing and predetermination hearing must not be elaborate, the process must include: "(1) oral or written notice to the employee of the charges against him; (2) an explanation of the employer's evidence; and (3) an opportunity for the employee to present his side of the story." *Montgomery*, 363 F.3d at 936.

In the Tenth Circuit, once it has been established that an employee holds a protected property right, the employee must then provide evidence that he was deprived of the property right without proper procedure. *Stearns v. Sheridan County Mem'l Hosp. Bd. of Trs*., 491 F.3d 1160, 1162 (10th Cir. 2007). To determine whether the Fourteenth Amended has been satisfied,

courts should look to the underlying source of law to determine what amount of procedure is due under the constitutional minimum for the Fourteenth Amended. *Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1, 9-22 (1978); *Loudermill*, 470 U.S. at 554). If it is found that the procedures offered to the employee fell below the constitutional minimum, a due process violation has occurred. *Memphis Light, Gas & Water Div.*, 436 U.S. at 19.

As noted above, the Due Process clause of the Constitution requires, at a minimum, that the government provide notice of the deprivation, a <u>purposeful pre-deprivation hearing</u>, conducted by an <u>impartial adjudicator</u> to the matter in dispute. *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) (emphasis added); *Goldberg v. Kelly*, 379 U.S. 254 (1970); *Caperton v. A.T. Massey Coal Co., Inc.*, 129 S. Ct. 2252 (2009). The Tenth Circuit has similarly adopted the *Matthews v. Aldridge* test, which calls for the courts to apply the following three factor inquiry:

> First, the private interest that would be affected by the official action; second, the risk of erroneous deprivation of such interest through the procedures used, and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. 319, 335 (1976) (citations omitted); *McDonald v. Wise*, 769 F.3d 1202, 1213 (10th Cir. 2014) (analysis using the *Matthews v. Aldridge* Test). New Mexico courts have determined that due process is satisfied for cases involving public employment termination when the employee is protected from termination without just cause and they are provided with an opportunity to be heard. *City of Albuquerque*, 149 N.M. at 382.

However, not only does Federal law mandate that due process be afforded to protected property interests, NMSU's Administrative Rules and Procedure ("ARP") 10.50(10) specifically requires the predetermination hearing to be fair and before an impartial official or body.

NMSU_Clarkson00214, 00271. Further, ARP 10.50's primary purpose is to afford the faculty member facing serious disciplinary action with an adequate opportunity to present a defense to the claims and evidence presented by NMSU. *Id*. Importantly, to ensure a fair hearing, ARP 10.50(H)(6) provides: "[i[f corrective action is going to be pursued, the faculty member <u>will be provided a copy of the investigative report and access to the supporting documents</u> at the time the corrective action is formally proposed. NMSU_Clarkson00269-70 (emphasis supplied). Finally, further to ensure proper due process rights, ARP 10.50(N)(4)(a)(i) similarly provides that all appeals by faculty members need to be fair and adjudicated in an impartial manner.

Dr. Clarkson formally requested a hearing with NMSU related to his termination on January 31, 2018. NMSU_Clarkson00250. Included in his request, Dr. Clarkson asked NMSU to provide him with "all notes, phone records, emails, and any other records related to the decision to cancel my leave as well as any university email or written correspondence of any form that mentions and/or references me since November 1, 2017." *Id*. On February 1, 2018, Ralph Lucero, responded to Dr. Clarkson's request for records and informed Dr. Clarkson that he was beginning to collect the requested records. NMSU_Clarkson00252.

On April 2, 2018, Dr. Clarkson emailed Mr. Pontelli and asked when he could have his investigator interview the witnesses that were to present at the hearing prior to the hearing. NMSU_Clarkson—254-55. On April 2, 2018, Mr. Pontelli responded to Dr. Clarkson's request and explained to Dr. Clarkson that having an investigator interview the witnesses prior to the hearing was not within the scope of the informal fact-finding process. *Id*.

Despite Dr. Clarkson's numerous requests for the investigative reports and documents supporting the "just cause" for his termination, he was never provided with a complete and adequate record. Clarkson Decl. at ¶ 60; ARP § 10.50(13) Clarkson Hearing_Recording 1, at

3:10 – 3:22. Dr. Clarkson made it known on numerous occasions during his administrative hearing that NMSU had refused to provide him with the investigative report and disallowed his investigator from conducting simple interviews of the witnesses prior to the hearing. Despite his pleas, the administrative hearing continued, and Dr. Clarkson was confronted with records at the hearing for which he had no knowledge of. Clarkson Hearing_Recording 1, at 3:10 – 3:22.

Not only was Dr. Clarkson refused due process with respect to the evidence purposefully withheld from him, the hearing officer, Mr. Pontelli permitted witnesses at the hearing to refuse to answer relevant questions during direct and cross-examination. *See*, *e.g.*, Clarkson Hearing_Recording 1, at 46:50 – 49:00. Repeatedly throughout the hearing, witnesses simply refused to answer relevant lines of questioning and Mr. Pontelli, as the witnesses' colleagues/subordinates, allowed for their refusal to participate in the process.

Looking to the three-factor inquiry that this must engage in, first, the private interest affected is Dr. Clarkson's livelihood. Not only has this wrongful and unconstitutional termination caused him to lose employment with NMSU, it has thus far prevented him from securing another academic teaching position with another like university. NMSU not only damaged Dr. Clarkson's reputation in the academic community by terminating him, but by also allowing false allegations of plagiarism to be brought against him.

Second, it is clear that the entire process leading to the hearing, as well as the hearing itself made it impossible for Dr. Clarkson to have a proper, impartial hearing regarding his termination. Again, NMSU refused to provide Dr. Clarkson with a complete investigative file and supporting evidence for NMSU's claim that Dr. Clarkson was being terminated for "just cause." Dr. Clarkson's hearing was the definition of trial by ambush. He was not afforded the

materials to properly prepare for the administrative hearing due to the purposeful withholding of evidence by NMSU.

Not only was Dr. Clarkson refused pertinent evidence, the entirety of the hearing was tainted due to the individual charged with being the factfinder. The hearing officer/factfinder, Mr. Pontelli, was a direct subordinate of the head "prosecutor" during the hearing, Provost. Both Dr. Clarkson and Mr. Pontelli were placed a very precarious positions because of Mr. Pontelli's relationship with Provost. Provost hired Mr. Pontelli and therefore, Mr. Pontelli had outside, partial bias to rule in Provost's favor to "save his own skin." It is apparent in this matter that is exactly what Mr. Pontelli did. Mr. Pontelli allowed the hearing to proceed despite the numerous statements by Dr. Clarkson that he had not received a full and accurate investigative record. Further, Mr. Pontelli similarly allowed multiple witnesses to refuse to answer Dr. Clarkson's questions, which were directly relevant to the claims being made in the matter. Overall, Dr. Clarkson was subjected to a kangaroo court. Nothing in the processes used by NMSU from the inception of Dr. Clarkson's appeal up through the entirety of the administrative hearing could have ensured that Dr. Clarkson's Constitutional right to due process was respected.

Finally, permitting a just and proper administrative hearing for Dr. Clarkson would not have required outlandish expenses on behalf of NMSU. All NMSU had to do was properly turn over all evidence to Dr. Clarkson, pick a disinterested hearing master, and ensure that the witnesses at the hearing adequately responded to Dr. Clarkson's lines of questioning.

Given the above, it is evidence that Dr. Clarkson's due process rights were compromised due to Defendants' actions. Dr. Clarkson held a protected right to continued employment with NMSU. The procedures utilized by NMSU during Dr. Clarkson's hearing were a sham, designed to provide a façade of "justice." The procedures were similarly infected due to the partial and

bias nature of the hearing officer. Dr. Clarkson respectfully requests that the Court grant this

Motion in its entirety.

> **D. Even if This Court Finds that the "Procedures" were Adequate, Dr. Clarkson was Not Afforded Due Process Due to the Bias and Partiality Present in his Adjudicators.**

Dr. Clarkson challenges the inherent bias that was present during his administrative

hearing with NMSU. "A challenge to the procedural fairness of the administrative hearing is

reviewed de novo on appeal because the ultimate determination of procedural fairness amounts

to a question of law." *Nasha v. City of Los Angeles*, 125 Cal. App. 4th 470, 482, 22 Cal. Rptr. 3d

772, 779 (Cal. Ct. App. 2004); *see also Clark v. City of Hermosa Beach*, 48 Cal. App. 4th 1152,

1169, 56 Cal. Rptr. 2d 223, 233 (Cal. Ct. App. 1996) ("[T]his case concerns whether the Clarks

received a fair hearing before the City Council. That question is one of law, which we review de

novo").

Administrative hearings so broadly affect the rights of citizens and businesses that "the

undeniable public interest in fair hearings in the administrative adjudication arena, militate in

favor of assuring that such hearings are fair." *Nasha*, 125 Cal. App. 4th at 483, 22 Cal. Rptr. 3d

at 780. As one court reviewing the action of a city council stated:

> A fair trial in a fair tribunal is a basic requirement of due
> process. This applies to administrative agencies which adjudicate
> as well as to courts. Not only is a biased decisionmaker
> constitutionally unacceptable, but our system of law has always
> endeavored to prevent even the probability of unfairness.
>
> *       *       *
>
> We have further stated that 'the very appearance of
> complete fairness must be present.

*Hanig v. City of Winner*, 692 N.W.2d 202, 205-06 (S.D. 2005) (internal quotes omitted)

(finding city council did not give a fair hearing in denying renewal of liquor license).

The United States Supreme Court has made clear that "a 'fair trial in a fair tribunal is a basic requirement of due process.' [cite omitted]  This applies to administrative agencies which adjudicate as well as to courts." *Withrow v. Larkin*, 421 U.S. 35, 46, 95 S.Ct. 1456, 1464 (1975) (emphasis supplied).  Stated differently, according to the Supreme Court, impartiality in an adjudicatory body is paramount.  *See Williams v. Pennsylvania*, 136 S.Ct. 1899, 1908-099, 195 L. Ed. 2d 132 (2016) (finding an "unacceptable risk of actual bias" and stating, "[a]n insistence on the appearance of neutrality is not some artificial attempt to mask imperfection in the judicial process, but rather an essential means of ensuring the reality of a fair adjudication.  Both the appearance and reality of impartial justice are necessary to the public legitimacy of judicial pronouncements and thus to the rule of law itself.").  Furthermore, "any administrative decision maker who has made an unalterable prejudgment of operative adjudicative facts is considered biased." *Fitzgerald v. City of Maryland Heights*, 796 S.W.2d 52, 59 (Mo. App. E.D. 1990) (*citing State ex. Rel. Brown v. City of O'Fallon*, 728 S.W.2d 595, 598 (Mo. App. 1987)).

The United States Supreme Court has explained that "[n]ot only is a biased decisionmaker constitutionally unacceptable but <u>our system of law has always endeavored to prevent even the probability of unfairness</u>." *Withrow*, 421 U.S. at 47, 95 S.Ct. at 1464 (emphasis supplied).  As such, "the rule against bias has been framed in terms of probabilities, not certainties. <u>The law does not require the disappointed applicant to prove actual bias. Rather, there must not be 'an unacceptable probability of actual bias' on the part of the municipal decision maker</u>." *Woody's*, 233 Cal. App. 4th at 1021-22, 183 Cal. Rptr. 3d at 325 (*quoting Nasha*, 125 Cal. App. 4th at 483, 22 Cal. Rptr. 3d at 772) (emphasis supplied). Even the New Mexico Court of Appeals has recognized that administrative bodies must be impartial and *avoid even the probability of unfairness. See, e.g.*, *City of Albuquerque v. Chavez*, 1997-NMCA-054, ¶

15, 123 N.M. 428, 433, 941 P.2d 509, 514 (in order to guarantee a fair hearing, "we hold that where a reasonable person would have serious doubts about whether the hearing officer could be fair, it is inappropriate for the hearing officer to hear the case."). Specifically, courts in New Mexico utilize an objectivity inquiry. *Id. citing Reid v. New Mexico Bd. of Examiners of Optometry*, 1979-NMSC-005, ¶ 6, 92 N.M. 414, 415, 589 P.2d 198, 199. At a minimum, "a fair and impartial tribunal requires that the trier of fact be disinterested and free from any form of bias or predisposition regarding the outcome of the case. *Id. citing Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927); *National Labor Relations Board v. Phelps*,136 F.2d 562 (5th Cir. 1943). The principles surrounding bias and impartiality "apply to administrative proceedings as well as to trials." *Id*.

With respect to administrative agencies, New Mexico courts have found the following:

> At a minimum, a fair and impartial tribunal requires that the trier of fact be disinterested and free from any form of bias or predisposition regarding the outcome of the case. In addition, our system of justice requires that the appearance of complete fairness be present. The inquiry is not whether the Board members are actually biased or prejudiced, but whether, in the natural course of events, there is an indication of a possible temptation to an average man sitting as a judge to try the case with bias for or against any issue presented to him.
>
> ... The rigidity of the requirement that the trier be impartial and unconcerned in the result applies more strictly to an administrative adjudication where many of the customary safeguards affiliated with court proceedings have, in the interest of expedition and a supposed administrative efficiency, been relaxed.

*Reid*, 92 N.M. at 416, 589 P.2d at 200. New Mexico courts have similarly determined two types of bias that, where present, require immediate disqualification: 1) "A personal bias or personal prejudice, that is, an attitude toward a person, as distinguished from an attitude about an issue, is a disqualification when it is strong enough; such partiality may be either animosity or

favoritism"; or 2) "One who stands to gain or lose by a decision either way has an interest that may disqualify; even a legislator may be disqualified on account of a conflict of interest." *See Las Cruces Professional Fire Fighters v. City of Las Cruces*, 123 N.M. 239, 246, 938 P.2d 1384, 1391 (1997), *quoting* Kenneth Culp Davis, *Administrative Law Treatise*, § 19:1, at 371–72 (2d ed. 1980).

Here, Dr. Clarkson's administrative appeal was "infected" from its inception. The hearing officer, Mr. Pontelli, for the hearing had undoubtedly already came to an unalterable prejudgment prior to the Dr. Clarkson's hearing. Not only did Mr. Pontelli come to an unalterable prejudgment, Mr. Potelli was predisposed to rule in favor of NMSU. Mr. Pontelli presided as the hearing officer for Dr. Clarkson's hearing while Provost Howard served as lead prosecutor at the hearing. Mr. Pontelli was hired by Provost Howard and Provost Howard is one of Mr. Lucero's direct supervisors. Despite the clear conflict of interest, neither Mr. Lucero nor Provost Howard recused themselves from the hearing.

As discussed above, Dr. Clarkson is not required to prove actual bias to prevail on his due process claim. Instead, Dr. Clarkson need only present evidence of the probability of bias during his administrative hearing. The relationship between Provost Howard and Mr. Lucero in an of itself denied Dr. Clarkson from obtaining a fair and impartial hearing. Mr. Pontelli proceeded with presiding over the proceeding even after he specifically acknowledged that Dr. Clarkson had been denied access to the entire investigative record – as required by AFR § 10.50. Mr. Pontelli similarly allowed the witnesses called at the hearing to refuse to answer relevant questions asked by Dr. Clarkson. To no surprise, Mr. Lucero found in favor of his direct supervisor and NMSU during Dr. Clarkson's hearing, even though he specifically found NMSU's conduct troubling, saying NMSU's "communication with Dr. Clarkson has been antagonistic, especially at the

Department and College levels, with limited attempts to seek mutual understanding and establish a positive protocol of communication and interaction." Clarkson Decl. at ¶ 69; NMSU_Clarkson 00158-61. A reasonable mind could find "there is an indication of a possible temptation to an average man [Mr. Pontelli] sitting as a judge to try the case with bias for or against any issue presented to him." Dr. Clarkson has presented sufficient evidence of an indication of bias in this matter. Consequently, the Court must grant the instant Motion as it relates to Dr. Clarkson's due process violation cause of action.

## E. CONCLUSION

Dr. Clarkson's administrative hearing was inadequate. Dr. Clarkson was refused evidence, denied a proper hearing, and tried by a bias tribunal, which allowed NMSU defeat Dr. Clarkson through a trial by ambush. Dr. Clarkson's finances and reputation have been directly affected by Defendants' unconstitutional hearing. As a result, Dr. Clarkson requests that this Court grant the instant Motion in its entirety.

Respectfully Submitted,


HOWARD & HOWARD ATTORNEYS, PLLC

__/s/ Brian J. Pezzillo_____
Brian J. Pezzillo, Esq.
NM Bar #9029
3800 Howard Hughes Pkwy., Ste. 1000
Las Vegas, NV 89169
Ph:  702-667-4839
Facsimile: 702-567-1568
bjp@h2law.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the 11th day of January, 2021 I filed the foregoing

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING**

**VIOLATION OF DUE PROCESS – 42 U.S.C. § 1983** electronically through CM/ECF system,

which caused all counsel of record to be served electronically:

Christa M. Hazlett, Esq.
Kathy L. Black, Esq.
320 Gold SW, Suite 800
Albuquerque, NM 87102
klb@conklinfirm.com;
cmh@conklinfirm.com
***Attorneys for Defendants***

Respectfully Submitted,

HOWARD & HOWARD ATTORNEYS, PLLC

___*/s/ Brian J. Pezzillo*_____
Brian J. Pezzillo, Esq.
NM Bar #9029
3800 Howard Hughes Pkwy., Ste. 1000
Las Vegas, NV 89169
Ph:  702-667-4839
Facsimile: 702-567-1568
bjp@h2law.com